LUBIN AND ENOCH, P.C.
Stanley Lubin (AZ 003076)
349 North 4th Avenue
Phoenix, Arizona 85003-1505
Telephone: (602) 234-0008
Facsimile: (602) 626-3586
Email: Stan@lubinandenoch.com

STUMPHAUZER, O'TOOLE, McLAUGHLIN,
McGLAMERY & LOUGHMAN CO., LPA
Matthew A. Dooley (OH 0081482)
Anthony R. Pecora (OH 0069660)
Dennis M. O'Toole (OH 0003274)
5455 Detroit Road
Sheffield Village, Ohio 44054
Telephone: (440) 930-4001
Facsimile: (440) 934-7208
Email: mdooley@sheffieldlaw.com
       apecora@sheffieldlaw.com
       dotoole@sheffieldlaw.com

CONSUMER LITIGATION ASSOCIATES, P.C.
Leonard A. Bennett (VA 27523)
Susan M. Rotkis (VA 40693)
763 J. Clyde Morris Blvd. 1-A
Newport News, Virginia 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
       srotkis@clalegal.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| KELVIN D. DANIEL, et al.<br><br>Plaintiffs,<br><br>v.<br><br>SWIFT TRANSPORTATION CORPORATION,<br><br>Defendant. | Case No. 2:11-cv-01548-PHX-ROS<br><br>**DECLARATION OF MATTHEW A. DOOLEY**<br><br>Assigned to: Hon. Roslyn O. Silver |

1

Exhibit 1

I, Matthew A. Dooley, declare:

1. My name is Matthew A. Dooley. I am over 21 years of age, of sound mind, capable of executing this declaration, and have personal knowledge of the facts stated herein, and they are all true and correct.

2. I am one of the attorneys working on behalf of the Plaintiffs in the above styled litigation, and I am an attorney and a director at Stumphauzer, O'Toole, McLaughlin, McGlamery and Loughman, Co., LPA, a multiple attorney law firm with its principal office located at 5455 Detroit Road, Sheffield Village, Ohio 44054.

3. Since 2006, I have been and presently am a member in good standing of the Bar of the highest court of the State of Ohio, where I regularly practice law. I have also been admitted to practice before and am presently a member in good standing of the Bars of the following courts:

| Court: | Date Admitted: |
|---|---|
| Florida State Bar | 2005 |
| United States Court of Appeals for the Sixth Circuit | 2008 |
| United States District Court for the Northern District of Ohio | 2008 |
| United States District Court for the Western District of Tennessee | 2011 |
| United States District Court for the Southern District of Ohio | 2009 |
| United States District Court for the | |

Western District of New York                                              2012

I have been admitted *pro hac vice* in jurisdictions across the country including Kentucky, Tennessee, Missouri, Arizona, Oregon, California and Florida. I have never been denied admission *pro hac vice*.

4. Since 2009, I have focused my practice primarily towards consumer protection litigation. While my experience representing consumers has come within several areas, my most developed area of expertise is in plaintiffs litigation under the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. and the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et seq.

5. I have substantial experience in complex litigation, including class action cases, prosecuted under the Consumer Credit Protection Statutes, including the Fair Credit Reporting Act and the Fair Debt Collection Practices Act.

6. In each of the class cases where I have represented Plaintiffs in a Consumer Credit case, the Court found me to be adequate class counsel.

7. I have read all the deposition transcripts in this case together with all pleadings and motions filed by both parties.

8. On August 1, 2012, Plaintiffs conducted the deposition of Michelle Cordova. A complete, true and correct copy of Cordova's deposition transcript is attached hereto as Exhibit A.

9. Swift first disclosed Cordova on January 9, 2012 as Swift's Regional Recruiting Manager expected to testify about "the general number of applicants who apply in-person versus not-in-person, the timing of procurement of consumer reports, the

Plaintiffs' application process and materials and the allegations contained in the First Amended Complaint." [Swift's Initial Disclosures, p. 4].

  10. In relevant part, Cordova testified on August 1, 2012 regarding the following facts:

  a. Cordova has never reviewed the Fair Credit Reporting Act. [August Cordova Dep. p. 8].

  b. Cordova instructs recruiters regarding the procurement of applicants' consumer reports. [August Cordova Dep., pp. 32-33, 38].

  c. Swift recruiters are trained to order consumer reports containing information regarding applicants' motor vehicle records, employment history and criminal background. [August Cordova Dep. pp. 34-35].

  d. Swift recruiters were trained "not to give specifics as to why an individual is not hired." [August Cordova Dep. pp. 35-36].

  e. Prior to September 2011, recruiters were trained to tell applicants "We've elected not to hire you at this time." [August Cordova Dep. pp. 36-39, 41, 72, 98-99].

  f. When using consumer reports to deny employment, Swift provides no additional information to applicants. [August Cordova Dep. p. 38].

  g. Prior to September 2011, all recruiters should have followed Swift's policy not to advise applicants when a consumer report had been used to deny employment because "[a] recruiter should always tell them, 'We've elected not to hire you'." [August Cordova Dep. pp. 36-39, 41, 72, 98-

99].

h. Even when the decision to deny employment was made by Swift's security department, the recruiter was responsible for informing the applicant that employment had been denied. [August Cordova Dep. p. 39].

i. Regardless of whether an applicant applied in person or online, recruiters never provided applicants with HireRight's address or telephone number unless the applicant specifically requested such information. [August Cordova Dep. p. 41].

j. Prior to September 2011, any applicant who asked for a copy of his HireRight report would have been referred to the HR Compliance department. [August Cordova Dep. p. 42].

k. Prior to September 2011, Swift's application forms never mentioned the Fair Credit Reporting Act. [August Cordova Dep. pp. 74-75].

l. Swift recruiters were trained to follow a specific protocol during telephone conversations with applicants, which only required recruiters to advise applicants that a DAC and MVR report would be requested. The source of the information, the fact that a criminal background report would also be obtained, the fact that the applicant could dispute these reports, and the fact that the applicant could receive a free copy of these reports within 60 days was never communicated to the applicant. [August Cordova Dep. pp. 60-61, 77].

m. Prior to March 2011, Swift received applications online using a format that did not contain any reference to consumer reports, nor did the online application inform applicants of their right to a free copy of any consumer report obtained by Swift, or that the applicant may dispute the accuracy or completeness of the report with the consumer reporting agency. [August Cordova Dep. Exhibits 6 and 8].

n. In March 2011, Swift revised its online application to include a singular statement, "I have read and agree to the above release and I give permission to obtain consumer reports about me from DAC." [Cordova Dep. Exhibit 15]. The revised application does not inform applicants of their right to a free copy of any consumer report obtained by Swift, or that the applicant may dispute the accuracy or completeness of the report with the consumer reporting agency. [Id.].

o. If an applicant was denied employment based upon criminal background information, Swift security personnel note the applicant's file with, "Applicant not approved for hire by investigations." [Cordova Dep. p. 86] [August Cordova Dep. Exhibit 10].

p. In September 2011, Swift began providing written notice to all applicants who were denied employment based in whole or in part on information contained in a consumer report. [Cordova Dep. pp. 97-100], [August Cordova Dep. Exhibit 14].

q. From September 2011 through February 2012, Swift provided all

6

Exhibit 1

applicants with the form provided as [August Cordova Dep. Exhibit 12]. [Cordova Dep. p. 94]. Swift construed [August Cordova Dep. Exhibit 12]. as an authorization to procure an applicant's consumer report. [Id.]

    r. Exhibit 12 to Cordova's August deposition transcript does not advise applicants that they may receive a free copy of their report, or that they may dispute the accuracy or completeness of the report directly with HireRight. [Id.].

    s. From February 2012 until March 2012, Swift provided all applicants with the form provided as [August Cordova Dep. Exhibit 13]. [August Cordova Dep. p. 96]. Swift construed [August Cordova Dep. Exhibit 13] as an authorization to procure an applicant's consumer report. [Id.].

    t. [August Cordova Dep. Exhibit 13] does not advise applicants that they may receive a free copy of their report, or that they may dispute the accuracy or completeness of the report directly with HireRight. [Id.].

    u. Swift made a minor revision to [August Cordova Dep. Exhibit 13] in May 2012 to include the phrase, "during the hiring process" to the form. [August Cordova Dep. p. 96] [Exhibit B; filed under seal pursuant to the Protective Order ECF DOC. #56].

11. On September 14, 2012, Plaintiffs conducted Cordova's deposition as Swift's designated witness pursuant to a Notice of Deposition served pursuant to Civ. R. 30(b)(6) [ECF DOC #82]. Further, a complete, true and correct copy of Cordova's September 14, 2012 deposition transcript prepared by AZ Litigation Support, LLC is

attached hereto as [Exhibit C]. Cordova did not waive signature and has not yet provided an errata sheet or signature page.

    12. In relevant part, Cordova testified on September 14, 2012 regarding the following facts:

    a. Recruiters make live telephone contact with applicants who are not immediately rejected based upon information contained in an application. [September Cordova Dep. pp. 20-21]. Notes regarding the recruiter's conversation with an applicant are maintained in Swift's electronic Contact Management System. [Id.].

    b. Swift's Contact Management System automatically logs the date and time that consumer reports are procured regarding applicants. [Id.].

    c. Only Swift's security department has access to applicants' criminal background reports. [September Cordova Dep. p. 22].

    d. Swift's security department reviews every criminal background reports. [September Cordova Dep. p. 27].

    e. Swift's security department generates notes regarding its review of applicants' criminal background reports. [September Cordova Dep. p. 22].

    f. Such notes include statements made available to Swift recruiters indicating whether an applicant was "okay to hire" or declined. [September Cordova Dep. p. 23-24].

    g. Additionally, Swift's security department maintains its own database

regarding applicants screened by the department. [September Cordova Dep. p. 25].

    h. This database includes notations regarding the denial of applicants based upon criminal background report. [September Cordova Dep. p. 31].

    i. Further, the hard copy of this database includes notes from the communications between the applicants and the Security Department [September Cordova Dep. p. 41, 58].

    j. Swift's Security Department interviews applicants when a criminal background report reveals information not disclosed on an application, or when an applicant self-discloses potentially disqualifying information. [September Cordova Dep. p. 41, 65].

    k. Even when an applicant self-discloses potentially disqualifying information, Swift obtains the applicant's criminal background report and compares the information on the report with the information disclosed by an applicant. [September Cordova Dep. p. 49, 65].

    13. I have also reviewed a substantial portion of the documents produced by Swift, together with all Rule 26 disclosures and written discovery responses. Swift produced documents comprising applications and forms provided to online applicants during the time period before March 2011, and between March 2011 and the present. [Exhibit D].

    14. Aside from information contained within an application, Swift did not provide additional documents to online applicants regarding the Fair Credit Reporting Act

until September 2011. [August Cordova Dep. p. 94-95].

15. Swift presently uses [Exhibit B] to obtain consent from all applicants to obtain the applicants' consumer reports. [August Cordova Dep. p. 96].

16. Again, [Exhibit B] does not advise applicants that they may receive a free copy of their report, or that they may dispute the accuracy or completeness of the report directly with HireRight.

17. Both Parties requested information from HireRight regarding the identity of applicants about whom Swift procured a consumer report for employment purposes from August 8, 2006 through March 31, 2012.

18. On September 10, 2012, Swift disclosed emails between Swift's counsel and HireRight regarding Swift's ability to ascertain the number of applicants about whom Swift procured a consumer report for employment purposes. [Exhibit E].

19. As explained in [Exhibit E], HireRight advised that Swift had procured 271,072 unique orders between August 1, 2009 and Match 31, 2012. [Exhibit E].

20. On September 27, 2012, and in response to a subpoena issued by Plaintiffs, HireRight produced several Excel spreadsheets identifying approximately 516,230 applicants, all of which were the subject of a consumer report procured by Swift between August 8, 2006 and April 1, 2012.

21. Between 80% than 90% of all Swift applicants apply online. [August Cordova Dep. 28-29].

22. Using the documents and electronic data produced by Swift, Plaintiffs can determine whether an applicant applied online or in-person.

23. More specifically, Plaintiffs can reasonably identify applicants who applied online or by other non-in-person means between August 8, 2006 and July 21, 2011.

24. Swift also produced an Excel spreadsheet maintained by its Security Department in the course of reviewing applicants' criminal backgrounds.

25. This spreadsheet identified 27,738 applicants interviewed by Swift's security department due to the applicants' criminal history.

26. This information is sufficiently detailed to allow Plaintiffs to determine whether Swift's Security Department rejected an applicant due to his or her criminal background between August 8, 2006 and July 21, 2011.

27. On September 10, 2012, Swift agreed to "not contest numerosity of the putative class set forth in Count III of the [First Amended Complaint]." [Exhibit H].

28. Further, Swift agreed not to oppose class certification by proffering the identities of applicants who requested from Swift, a copy of their consumer report used by Swift for employment purposes from 2006 through 2012. [Exhibit H].

29. On March 2, 2012, Plaintiffs propounded interrogatories upon Swift, which included a contention interrogatory seeking "all facts and all legal contentions as applied to the facts that support your denial [that a class action can properly be certified]". On September 11, 2012, Swift served its Third Amended Responses to Plaintiffs' First Set of Interrogatories [Exhibit F], identifying the following Rule 23 issues:

    a. Whether the applicant applied in-person, over the telephone or fax, through the internet, by mail, or via another method;

    b. Whether the applicant was qualified to drive under the Company's

standards;

c. Whether the applicant was qualified to drive under DOT standards, including whether the applicant had a CDL license and spoke English;

d. Whether Swift ordered a consumer report for the applicant;

e. What version of the employment application the applicant reviewed and submitted;

f. Whether the applicant properly completed an employment application for submission to Swift;

g. When the applicant submitted his/her application to Swift;

h. What information the applicant provided on their employment application;

i. Whether the applicant was automatically disqualified from employment with Swift and, if so, why;

j. Whether the applicant successfully challenged information contained on a consumer report and obtained an offer of employment;

k. Whether the applicant challenged information contained on a consumer report and was denied employment or never responded to further requests for information from Swift;

l. Whether the applicant completed a Swift Questionnaire, including whether the applicant did so truthfully;

m. Whether the applicant received a copy of the consumer report(s);

n. What the applicant told the recruiter about his/her application,

Exhibit 1

background, and experience;

o. Whether the applicant was truthful as to all aspects of, and information provided on, their employment application;

p. What information the applicant's consumer report(s) contained, if any, that would disqualify the applicant from employment with Swift;

q. What type of notice Swift provided to the applicant that consumer reports would be procured;

r. What type of consent the applicant provided, whether written, oral, electronic, or otherwise, from to Swift to obtain a-consumer report(s);

s. Which authorization or consent the applicant reviewed and agreed to on the differing versions of Swift's employment applications;

t. What version of the written disclosure and consent form(s) the applicant received;

u. Whether Swift based any hiring decision on an applicant's consumer report(s);

v. What factors led to the decision to offer, not offer, hire or not hire the applicant, such as whether the applicant passed a drug or driving test or physical examination;

w. Whether the applicant was interviewed and, if so, by whom, what the applicant said during the interview, whether it was truthful, and what impression the applicant made during the interview;

x. What the recruiter and/or processor told the applicant about his/her

application, including whether Swift would procure consumer report(s) regarding the applicant;

y. Whether that-any such information was provided to the applicant in writing;

z. Whether the applicant understood that trucking companies such as Swift would always procure consumer report(s) regarding the applicant as part of an industry practice;

aa. What is common knowledge in the industry among applicants applying for driver positions at trucking companies;

bb. Whether Swift's Security Department interviewed the applicant;

cc. What the applicant told the Security Department official;

dd. What the Security Department official told the applicants;

ee. Whether the applicant had a disqualifying criminal conviction;

ff. Whether the applicant had any disqualifying moving or traffic violations;

gg. Whether the applicant attended a Swift orientation or failed to appear;

hh. What type of notice the applicant had regarding a possible violation of the FCRA;

ii. When the applicant discovered a possible violation of the FCRA;

jj. Why Swift decided not to hire the applicant, including falsification of application or revealing disqualifying information, including but not limited to information not contained in a consumer report, in an interview (either to a recruiter or the Security Department);

kk. What types of damages the applicant seeks, including statutory and punitive damages, as opposed to actual damages and other types of relief;

ll. Whether the applicants' injuries are typical due to various applicants receiving differing FCRA disclosures and notices;

mm. Whether it is possible to ascertain and/or identify the putative class members for Counts I through IV of the FAC;

nn. Whether the process to ascertain and/or identify the class members is unduly cumbersome and burdensome, inefficient, and unmanageable; and

oo. Whether Plaintiffs are adequate class representatives. [Id.].

30. Since the beginning of the litigation, Hodges and Daniel have received copies of all major pleadings and motions, and have discussed same with me, as well as other members of my firm. Further, Hodges and Daniel personally met with me, as well as other members of my firm, to discuss the substance of their respective claims, and to prepare for the extensive video depositions conducted by Swift. During these interactions, Daniel and Hodges displayed a basic knowledge of the allegations and the procedure by which relief is sought.

I declare under penalty of perjury of the laws of the United States that the foregoing is correct.

Signed this 1st day of October, 2012.

Matthew A. Dooley

Exhibit 1