UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


KELVIN D. DANIEL, et al.,     )
                            )
        Plaintiffs,    )
                            )
     vs.             )
                            ) No.
SWIFT TRANSPORTATION      ) 2:11-cv-01548-PHX-ROS
CORPORATION,           )
                            )
        Defendant.    )
_____ )


DEPOSITION OF SWIFT TRANSPORTATION CORPORATION
30(b)(6) REPRESENTATIVE MICHELLE CORDOVA


Phoenix, Arizona
September 14, 2012
10:31 a.m.


Reported By:
Wanda J. Curry, RPR, RMR
CCR #50366 (AZ)

Prepared for:
MATTHEW A. DOOLEY, ESQ.

(Copy)

EXHIBIT C

1                          I N D E X

2      30(b)(6) REPRESENTATIVE MICHELLE CORDOVA

3                        EXAMINATION
                                              Page   Line
4      BY:  Mr. Foster  .  .  .  .  .  .  .  .  .  .  4     16

5

6

7

8

9

10

11

12                  PLAINTIFFS' DEPOSITION EXHIBITS
       No.                                             Page
13
        1      "Plaintiffs' Amended Notice of F.R.C.P.      8
14             30(B)(6) Corporate Deposition(s) of
               Defendant Swift Transportation Corporation
15             (eight pages)

16

17

18

19

20

21

22                        RECESSES
                                              Page   Line
23     (Recess at 11:15 a.m.; resumed at 11:32 a.m.) 36     3
       (Recess at 11:50 a.m.; resumed at 12:00 p.m.) 48    22
24

25

1          BE IT REMEMBERED that the deposition of

2    the Swift Transportation Corporation 30(b)(6)

3    Representative MICHELLE CORDOVA was taken at the

4    offices of Snell & Wilmer, L.L.P., One Arizona Center,

5    400 East Van Buren Street, Suite 1900, in the City of

6    Phoenix, County of Maricopa, State of Arizona, before

7    WANDA J. CURRY, a Certified Reporter, Certificate

8    No. 50366, in and for the State of Arizona, on the

9    14th day of September, 2012, commencing at the hour of

10   10:31 a.m., on behalf of the defendant in a certain

11   cause now pending in the United States District Court,

12   in and for the District of Arizona.

13
     APPEARANCES:
14
     For the plaintiffs (telephonically):
15        Stumphauzer, O'Toole, McLaughlin, McGlamery &
               Loughman Co., L.P.A.
16        MATTHEW A. DOOLEY, ESQ.
          ANTHONY R. PECORA, ESQ.
17        DENNIS M. O'TOOLE, ESQ.
          5455 Detroit Road
18        Sheffield Village, Ohio  44054
          440-930-4001
19
     For the defendant:
20        Snell & Wilmer, L.L.P.
          BRIAN J. FOSTER, ESQ.
21        JOSEPH A. KROEGER, ESQ.
          One Arizona Center
22        400 East Van Buren Street, Suite 1900
          Phoenix, Arizona  85004
23        602-382-6000

24

25

EXHIBIT C

```
 1                 (The witness was duly sworn.)

 2                 MR. DOOLEY:  And just so we have a clear

 3      record, Brian or Joe, could we have an accounting of

 4      who's with you there, both in person and perhaps on the

 5      phone?

 6                 MR. FOSTER:  Okay.  On our end, it's

 7      Brian Foster and Joe Kroeger and then the witness.

 8                 MR. DOOLEY:  All right.  And we have Dennis

 9      O'Toole, Anthony Pecora and myself here, all in person.

10

11                      MICHELLE CORDOVA,

12      called as a witness herein, having been first duly

13      sworn to tell the truth, the whole truth, and nothing

14      but the truth, was examined and testified as follows:

15

16                      EXAMINATION

17      BY MR. DOOLEY:

18          Q.   Ms. Cordova, how are you doing this morning?

19          A.   Good, thank you.

20          Q.   Would you state your full name for the

21      record, please?

22          A.   Michelle Cordova.

23          Q.   Thank you.

24                 MR. DOOLEY:  And before we get into the line

25      of questioning that brings you back today, I do have
```

1    one housekeeping matter that relates to a dispute about

2    the scope of this deposition.

3          And Joe and I had a conversation this morning

4    about the continuation of this deposition subject to

5    the plaintiffs' right to seek a remedy for the issues

6    raised during the meet-and-confer conference this

7    morning that would include Swift's objection to

8    topic 11 as well as topics 17 through, I believe, 29.

9    The understanding being that we would go forward today

10   on topics 3, 4, 6 and 13, subject to raising that

11   dispute later with the courts.  Swift not using waiver

12   as a position or argument in that dispute.

13         Do I have that correct?

14         MR. FOSTER:  Yeah.

15         No, basically everybody is reserving all of

16   the objections and arguments that have been made in the

17   numerous emails and other transmissions that have gone

18   back and forth.  That's -- that's our position.  Both

19   sides have reserved all of their legal arguments and

20   positions.

21         And frankly, whether we had an agreement on

22   the record or not, that would be the state of things

23   anyway.

24         MR. DOOLEY:  Okay.  All right.

25      Q.   BY MR. DOOLEY:  Ms. Cordova, I believe you

EXHIBIT C

1    may recall meeting me.  I didn't question you but I was

2    with Mr. Bennett during your deposition on August the

3    1st of 2012.  And during that deposition, you were

4    questioned regarding your personal knowledge of certain

5    events; do you remember that?

6        A.   Yes.

7        Q.   And you remember that we had a couple of

8    ground rules that day that included answering verbally

9    as opposed to head nods or things of that nature and

10   you also agreed that if a question was asked that was

11   vague or confusing to you that you would let

12   Mr. Bennett know.  Do you remember that?

13       A.   Yes.

14       Q.   The same ground rules would apply today.

15            And I've asked the court reporter to please

16   transcribe not only the verbal communications but the

17   non-verbal communications that may or may not take

18   place.  She's agreed to do that.  I'm not there to see

19   you, so unfortunately all I'll be left with is a

20   transcript.  But those same ground rules will apply.

21            There may be a question that's asked and

22   objected to by your layer, Mr. Foster.  If there is

23   such a question, Mr. Foster is not attempting to

24   communicate with you.  He's attempting to communicate

25   with me.  And unless Mr. Foster instructs you not to

1    answer the question, I would ask that you proceed to

2    answer it.  Is that okay?

3         A.   Yes.

4         Q.   All right.  You're here today -- or you're

5    there today because a notice of deposition was served

6    on Swift and asked Swift to produce a representative to

7    answer questions on the company's behalf.  You were

8    designated as that person.  Do you understand that?

9         A.   Yes, I do.

10        Q.   Your answers that you provided in your

11   deposition on August the 1st pertain to your personal

12   knowledge.  Your answers today are intended to pertain

13   to the company's knowledge about the questions that are

14   asked.  Do you understand that?

15        A.   Yes.

16             MR. FOSTER:  And just -- this is Brian --

17   just so the record is clear, she's here as the

18   representative of Swift Transportation Company of

19   Arizona, L.L.C.

20             MR. DOOLEY:  Thank you, Brian.

21        Q.   BY MR. DOOLEY:  Ms. Cordova, I provided,

22   prior to beginning this deposition this afternoon here

23   and this morning there, a copy of plaintiffs' amended

24   notice of 30(b)(6) corporate deposition.  I provided

25   that to Mr. Kroeger with the understanding I would use

1   that as an exhibit.  Do you have a copy of that?

2        A.   Yes.

3             MR. DOOLEY:  And I'd ask the court reporter

4   to mark that as an exhibit, please.

5             That will be Plaintiffs' Deposition

6   Exhibit 1.

7             (Plaintiffs' Deposition Exhibit 1 was marked

8   for identification.)

9             COURT REPORTER:  It's been marked.

10            MR. DOOLEY:  Thank you.

11       Q.   BY MR. DOOLEY:  Ms. Cordova, do you recognize

12   Plaintiffs' Exhibit 1?

13       A.   Yes, I do.

14       Q.   Can you tell me when you first saw

15   Plaintiffs' Exhibit 1?

16       A.   Approximately a week and a half to two weeks

17   ago.

18       Q.   Okay.  And do you recall who provided you

19   with a copy of Plaintiffs' Exhibit 1?

20       A.   Yes.

21       Q.   Who provided that to you?

22       A.   Brian Foster and Joe Kroeger.

23       Q.   Okay.  And did you review it at the time it

24   was given to you?

25       A.   Yes.

```
 1          Q.   Did you review it with anyone from Swift?

 2               And when I say "Swift," Ms. Cordova, I'm

 3     saying Swift Transportation Corporation of Arizona,

 4     L.L.C.

 5          A.   No.

 6          Q.   Have you, since that time, reviewed this

 7     Plaintiffs' Exhibit 1 with anyone other than Brian or

 8     Joe or any lawyer at Snell & Wilmer?

 9          A.   No.

10          Q.   Please take a --

11               MR. FOSTER:  Hey, Matt --

12               MR. DOOLEY:  Go ahead.

13               MR. FOSTER:  -- just so the record is clear,

14     the exhibit that's been marked as Exhibit 1, she

15     probably saw for the first time in the last day or

16     two.  I'm sure she was talking about your original

17     deposition notice.

18               MR. DOOLEY:  Okay, Brian.  Let me -- let me

19     clear that up, then.  Thanks for raising that.

20          Q.   BY MR. DOOLEY:  Michelle, would you take a

21     look at the top of the page, any of the pages, where it

22     says page 2:11-cv.  Do you see that?

23          A.   Yes.

24          Q.   "Document 82," is that the copy that you have

25     in front of you?
```

1        A.   Yes, it is.

2        Q.   All right.  Turn to page 5, where it says

3   "Exhibit 'A.'"

4        A.   I'm there.

5        Q.   All right.  Do you see numbers 1 through 16?

6        A.   1 through 16 on page 5?

7        Q.   1 through 16 is pages 5, 6 and 7.

8        A.   Yes, I do.

9        Q.   All right.  And you'll notice that some have

10   strike-throughs and some have some italicized text next

11   to them.  Do you see that?

12        A.   Yes.

13        Q.   All right.  Ignore the strike-throughs and

14   ignore the italicized text and review numbers 1 through

15   16 and confirm with me that you saw those topics

16   sometime a week and a half to two weeks ago.

17        A.   Yes, I did.

18        Q.   All right.  Did you have an understanding

19   when you reviewed this that you would be asked

20   questions about these topics and would be expected to

21   give testimony on behalf of Swift Transportation

22   Corporation of Arizona, L.L.C.?

23        A.   Yes.

24        Q.   All right.  I'd like you to take a look at

25   number 3.  Do you see number 3 on page 5?

1       A.   I do.

2       Q.   Just take a second and read it, if you

3  would.

4       A.   Would you like me to read that out loud or to

5  myself?

6       Q.   To yourself is fine.

7       A.   Okay.  I did.

8       Q.   All right.  I want to know, Ms. Cordova, what

9  you did to prepare to answer questions regarding that

10 topic.

11      A.   I met with the attorneys -- the Swift

12 attorneys, I spoke to Swift employees, and basically

13 used my own knowledge of -- I've been employed with

14 Swift Transportation for 15 years.

15      Q.   And sitting here today, what is your official

16 job title?

17      A.   Regional Recruiting Leader for the West

18 Coast.

19      Q.   And if I understand correctly, you have a

20 counterpart on the East Coast; correct?

21      A.   Yes.

22      Q.   And during your 15 years with Swift, you have

23 not always held that position; correct?

24      A.   That is correct.

25      Q.   Can you tell me the Swift employees with whom

1    you spoke to prepare to answer questions about topic 3?

2         A.    I spoke to Angelica Flores, Shawn Driscoll,

3    Jim Pope, Amy Gruver and Nicole Burleson.

4         Q.    Okay.  Ms. Cordova, had you brought any notes

5    with you today to help you recall any of these events?

6         A.    No.

7         Q.    After you spoke with those individuals and

8    after you spoke with your counsel, were you able to

9    formulate a number, on behalf of Swift, for the

10   applicants who were denied employment by Swift based in

11   whole or in part on information contained in a consumer

12   report each year from 2006 through 2012?

13        A.    No.  And in -- within Swift Transportation,

14   we -- we do not decline individuals based on the

15   third-party information received from a consumer

16   report.

17             Every individual is given an interview.  And

18   during that interview, they self-disclose information

19   firsthand on the areas that we're discussing.  So based

20   on the information that we receive from the applicant

21   is how the decision is made whether we will pursue the

22   hiring or whether we decline them.

23        Q.    Okay.  Thank you for that.

24             And that leads me, I think, to maybe switch

25   topics a bit.  I want you to look at topic 6.  Read

1    that to yourself, please.

2         A.    Okay.  I've read it.

3         Q.    Thank you.

4              My understanding of the "technological and

5    record-keeping ability" is something like this -- and

6    I'm going to ask you to tell me if I'm right or wrong

7    and I'm going to go through this step by step -- an

8    applicant can apply by non-in-person means, for

9    example, online or by phone, and an application will be

10   generated in Swift's database; correct?

11        A.    Yes.

12        Q.    And that application, on its face, may have

13   information that is disqualifying, based upon Swift's

14   hiring criteria; correct?

15        A.    "On its face"?  Can you elaborate?  Are you

16   referring to the application that the applicant placed

17   in the application?

18        Q.    Sure.

19             What I'm asking is an applicant can fill out

20   the application and he may not be old enough or he may

21   not have the requisite experience or he may

22   self-disclose a criminal record that, on its face, is

23   inconsistent with Swift's hiring guidelines; correct?

24        A.    Yes.

25        Q.    Okay.  And if that's the case, the

1   application does not proceed any further in Swift's

2   review process; correct?

3        A.   That's correct.  If the individual clearly

4   does not meet hiring guidelines, DOT guidelines, then

5   there is no reason to move forward.

6        Q.   And that application would then be segregated

7   from the group of applications?  It would be moved into

8   a different place for record-keeping purposes; correct?

9        A.   When you talk about the "database," what

10  database are you referring to?

11       Q.   Sure.

12            I understand that Swift has used a number of

13  different databases.  There's App Manager; correct?

14       A.   That's correct.

15       Q.   And would you please give me the time period

16  when Swift used App Manager?

17       A.   We began using Application Manager in March

18  of 2011.

19       Q.   And you use that presently; correct?

20       A.   Yes.

21       Q.   And that's maintained by a third party called

22  Randall-Reilly; correct?

23       A.   Yes.

24       Q.   And prior to using App Manager, Swift used

25  something called Workflow; correct?

1         A.    No.   We currently use Workflow and we did use

2    Workflow prior to, but that was not the actual web --

3    the web application system.   The system that we were

4    using prior to Application Manager was -- we refer to

5    it as Web App.

6         Q.    Web App?

7         A.    Yes.

8         Q.    And when did you use the Web App system?

9         A.    We used the Web App system since 2006.   I

10   believe it was -- we created it around 2001.

11        Q.    And the Web App system had a function to

12   segregate applications that were not, on their face,

13   from qualified applicants; correct?

14        A.    The Web App system?

15        Q.    Yes, ma'am.

16        A.    If you -- if you -- on the -- in the Web App

17   system, if you were going to consider the applicant

18   that you were looking at face value, that that

19   individual qualified just based off of the basic

20   requirements, you would move it into our Contact

21   Management system.   From Contact Management, it was

22   also in Workflow.   And that was used up until March of

23   2011.

24             If you were not interested and if the

25   individual did not meet DOT guidelines or hiring

1    qualifications, that application was not moved over

2    into our system.

3         Q.    Okay.  So those applications from applicants,

4    taken at face value, who met hiring criteria using

5    App Manager would have been moved into the content

6    management -- or Contact Management system; correct?

7              MR. FOSTER:  Object to the form, misstates.

8         Q.    BY MR. DOOLEY:  Why don't I rephrase it so we

9    have a nice, clear record?

10             An application that was going to be further

11   considered during the era of App -- or Web App would

12   have been moved over to the Contact Management system;

13   correct?

14        A.    Yes.

15        Q.    And those applications that were not moved

16   over, is there a name for the database or the holding

17   pen where those applications were stored?

18        A.    They remained in Web App.

19        Q.    And when Swift changed from Web App to

20   App Manager, were those old applications merged into

21   the new App Manager database?

22        A.    No.

23        Q.    Did Swift keep them?

24        A.    They remained within the database, the

25   Web App database.

1      Q.    And the Web App database is archived at

2   Swift?

3      A.    Yes.  We no longer use it.

4      Q.    But it's maintained by the company in some

5   fashion; correct?

6      A.    Yes.

7      Q.    Now, those individuals that would be in that

8   category of applications that were not, when taken at

9   face value, satisfactory under Swift's guidelines,

10  those individuals would not have been subject to a

11  consumer report; correct?

12     A.    I'm sorry, can you repeat your question?

13     Q.    Sure.

14           Would Swift obtain a consumer report about

15  applicants when the application, taken at face value,

16  did not meet Swift's hiring guidelines?

17     A.    During -- on the web application?

18     Q.    We'll start with the web application, so

19  between 2006 and March of 2011.

20     A.    No.  If we were not going to consider them as

21  an applicant, we did absolutely nothing with the

22  application.  Therefore, we would not order any type of

23  record.

24     Q.    Okay.  And so the record would only be

25  ordered -- well, strike that.

1              When the application, during 2006 through

2    March of 2011, was moved to the Contact Management

3    system, would someone from Swift contact the applicant?

4         A.   Yes.

5         Q.   And there would be further questioning of the

6    applicant regarding the answers he or she gave on the

7    application; correct?

8              MR. FOSTER:  Let me -- let me object here a

9    second, Matt.  I think you're going way beyond --

10             MR. DOOLEY:  You're going to argue scope,

11   aren't you, Brian?

12             MR. FOSTER:  Yeah, the scope of number 6.  I

13   mean, that's -- that's not --

14             MR. DOOLEY:  Well --

15             MR. FOSTER:  -- what she's here to talk

16   about.  You're rehashing the stuff that she's

17   already --

18             MR. DOOLEY:  Brian.

19             MR. FOSTER:  Let me make a record.

20             You're rehashing the issues that she's

21   already testified about individually and you're talking

22   about people who consumer reports weren't even run on,

23   and everybody on this phone call can agree that they're

24   not members of any purported class.

25             And that's what number 6 is asking her to

1   talk about, "record-keeping ability to determine class

2   membership."  And "class membership," by definition, is

3   people who had consumer reports run on them.

4              MR. DOOLEY:  Is that everything, Brian?

5              MR. FOSTER:  Yes, thank you.

6              MR. DOOLEY:  Thank you.

7              Brian, to respond to your comments, the point

8   is that Swift has a record-keeping system that we need

9   to understand and appreciate when it comes to

10  identifying class members.  The questions that I'm

11  asking Ms. Cordova are intended to understand that.

12             She answered questions in the past based upon

13  her personal knowledge.  She's here today as a Swift --

14  as Swift, as the company.  I'm not intending to rehash

15  and there will be, I think, if you allow me to

16  continue, some clarity in the way that this is

17  progressing.

18             Swift has a database.  Swift uses consumer

19  reports.  My questions are intended to figure out how

20  that happens, when that happens, from a database

21  standpoint, so that we can argue that we can identify

22  these folks; okay?

23             MR. FOSTER:  I'll give you a little more

24  latitude, but we're not going to go through the whole

25  recruiting and hiring process.

```
1              MR. DOOLEY:  We don't need to go through the

2    entire recruiting process.  We need to go through the

3    process to the extent that it relates to the way that

4    records are kept at Swift.

5              MR. FOSTER:  "To determine" --

6              MR. DOOLEY:  Now --

7              MR. FOSTER:  "To determine class membership,"

8    that's what the subject area is.

9              MR. DOOLEY:  You're exactly right, "to

10   determine class membership."

11             MR. FOSTER:  Okay.  I'll give you a little

12   more latitude, but...

13             MR. DOOLEY:  Okay.

14             MR. FOSTER:  Go ahead.

15             MR. DOOLEY:  Thank you.

16        Q.   BY MR. DOOLEY:  Ms. Cordova, before we were

17   interrupted, I was asking you questions about when

18   applicants are contacted by Swift recruiters.  And my

19   understanding of your testimony was that that happens

20   after the application was moved to the Contact

21   Management system, at least between 2006 and

22   March 2011; correct?

23        A.   No, that's not correct.

24        Q.   Please correct me.

25        A.   Prior to moving an application over, you had
```

1    to make live contact with the applicant.

2         Q.   All right.  In the database called Web App,

3    did Swift maintain a record of those communications?

4         A.   The recruiter was supposed to note

5    communication not in Web App but in Contact Management.

6         Q.   Okay.  So after the communication took place

7    and the application was moved to Contact Management,

8    the recruiter would then document the fact that he or

9    she had conversed with the applicant?

10        A.   Yes.

11        Q.   All right.  When the consumer reports are

12   procured by Swift, during the era of Web App, was there

13   a notation in the applicant's file?

14        A.   It was an automatically-generated notation.

15   When the admin that ordered the report, it would

16   automatically time stamp it.

17        Q.   And that time stamp would be transcribed in

18   the applicant's file as it was maintained in the

19   Contact Management system?

20        A.   Yes.

21             Now, Contact Management and Workflow worked

22   hand in hand with one another.  The recruiter worked

23   out of Workflow.

24        Q.   Who works out of Contact Management?

25        A.   Contact Management was mainly the space that

1    it sat in.  But if you worked from -- there -- as --

2    from a recruiter, they worked from the back side of it,

3    which would be considered Workflow.

4        Q.    Now, when a report was procured by Swift, my

5    understanding is that the criminal background component

6    of that was only transmitted to the security

7    department; correct?

8        A.    Yes.

9        Q.    When the security department reviewed the

10   criminal background component of any consumer report,

11   did anyone make any notations in an applicant's file?

12              MR. FOSTER:  Object to the form.

13              THE WITNESS:  Can you rephrase --

14       Q.    BY MR. DOOLEY:  Do you understand the

15   question?

16       A.    No.  I was just about to ask you if you would

17   rephrase that.

18       Q.    Sure.

19              When someone from the security department

20   reviewed the criminal background reports, did they make

21   notes in the respective applicant's file?

22       A.    Yes.

23       Q.    And when I say "file," what is your

24   understanding of what I'm talking about?

25       A.    "File" would be Workflow.

1      Q.    Okay.  And were those notes based on the

2   chosen words of the security personnel or did Swift use

3   codes?

4      A.    No, there were no codes.

5      Q.    There were no codes?

6      A.    No.

7      Q.    Would a security team member transcribe his

8   or her thoughts about the background in the report or

9   simply state whether the applicant was hirable or not?

10     A.    They would place a statement whether we could

11  proceed, which would be okay to -- the individual was

12  okay to hire, from their standpoint, or whether the

13  individual was declined.

14     Q.    All right.

15     A.    Those were the only notations they would

16  place in Workflow.

17     Q.    And when we're talking about applicants,

18  not -- not -- let me distinguish something for you.

19          I understand that those folks who work in the

20  security department also had occasion to review

21  criminal background reports when there would be some

22  incident with an existing employee, be it an allegation

23  of theft or a fight or some other problem with the

24  employee.  And I want to make sure you understand my

25  questions to exclude that process; okay?

1      A.   Yes.

2      Q.   I'm only talking about reviews conducted

3   about new job applicants; okay?

4      A.   Understood.

5      Q.   When the security team member would first

6   receive the background report, would he document

7   whether he contacted the applicant to discuss it?

8      A.   In --

9           MR. FOSTER:  Go ahead and answer, if you

10  know.

11          THE WITNESS:  I was asking -- in Workflow?

12     Q.   BY MR. DOOLEY:  In Workflow or any other

13  place.

14     A.   Not that I'm aware of.  I know in Workflow,

15  no.

16     Q.   So Swift does not document when or if

17  security team members contact applicants regarding

18  criminal background reports?

19     A.   The security team has their own -- it's -- I

20  don't know if I would call it a database, but they have

21  their own file-keeping that they have where they record

22  that information, because it is sensitive information.

23  And in Workflow, anyone who's in the recruiting

24  department has access to those records.

25     Q.   Does that database have a name?

1        A.    I -- I -- I don't know that it's a database.

2    I -- it's a file-keeping system.

3        Q.    Does that file-keeping system have a name?

4        A.    I do not know.

5        Q.    You spoke with --

6        A.    The --

7        Q.    -- Shawn Driscoll, I believe you said, as

8    part of your preparation for your testimony today;

9    correct?

10       A.    That's correct.

11       Q.    And Mr. Driscoll, if I understand correctly,

12   is in charge of the security department?

13       A.    Yes.

14       Q.    Did you discuss with Mr. Driscoll the manner

15   in which the security department maintains records

16   regarding applicants with whom they speak?

17       A.    I did, but I did not ask him what their

18   file-keeping system was named.

19       Q.    Did he describe it for you?

20       A.    No.

21       Q.    Do you know whether it's a paper file-keeping

22   system or whether it's computer-based?

23       A.    I do not know.  I -- I didn't ask the --

24   whether -- how they keep their records.

25       Q.    When security conducts their review of an

1    application and of a criminal background report, I do

2    understand -- correctly, I hope -- that there's some

3    document prepared or some note made that that process

4    took place; correct?

5         A.   Yes, I believe so.

6         Q.   And when an applicant is ultimately

7    determined to be not hirable, there is some

8    documentation of that decision; correct?

9         A.   Yes.

10        Q.   And to the extent that it relates to a

11   person's criminal background, that is a decision made

12   in the security department; correct?

13        A.   Yes.

14        Q.   When the security department receives a

15   criminal background report for review, do you know

16   whether they always -- or strike that.  Strike that.

17             Does the security department review every

18   single criminal background report, even the clean ones?

19             MR. FOSTER:  I'm going to object again,

20   Matt.  You're going way beyond the scope.

21             MR. DOOLEY:  Brian, I need to be able to

22   determine whether there's a group of folks that don't

23   fit in a class.  That would be a group of folks that

24   don't have criminal backgrounds.

25        Q.   BY MR. DOOLEY:  Now, Ms. Cordova, does the

1    security department review every single criminal

2    background report?

3          A.    Yes, I believe they do.

4          Q.    Earlier I asked you if Swift utilized a

5    coding process to communicate decisions about an

6    applicant's hirability.  You said they do not; correct?

7          A.    That's correct.

8          Q.    In some of the documentation that Swift has

9    provided, there's been reference to a code, D12.  Are

10   you familiar with that?

11         A.    Yes.

12         Q.    What does D12 mean?

13         A.    D12 is a termination code.  Those are for

14   individuals who have -- who are employed with Swift.

15         Q.    Okay.  So Swift uses codes to communicate

16   some hiring decisions but only those that pertain to

17   current employees?

18         A.    We have termination codes.

19         Q.    All right.  Would a termination be coded --

20   would a termination code be used to document a decision

21   not to hire someone?

22         A.    No.

23         Q.    Would there be any other code that would be

24   used not to hire someone?

25         A.    "Any other code" as in?

```
1        Q.   I used the word "code."

2        A.   I'm not sure --

3        Q.   I'm sorry.

4        A.   All right.

5        Q.   I used the word "code."  You refined it to

6   mean "termination code."

7             Are there other codes within the family of

8   codes that Swift would use to document a decision not

9   to hire?

10             An acronym, for example, a numeric code, a

11   symbol.

12        A.   No.

13        Q.   Did Swift use any common phrase in

14   record-keeping to document a decision not to hire

15   someone?

16        A.   "Common phrase" such as?  Do you have an

17   example?

18        Q.   Sure.  "Not hirable," "disqualified," "DMS,"

19   "not qualified."

20        A.   Those are words that we use, but they're not

21   codes.

22             "DMS," I'm not familiar with.

23        Q.   Okay.  Let's go through the words that Swift

24   uses.  I named a number of various phrases.  Can you

25   tell me the ones that Swift uses?
```

1       A.   As in "disqualified," the individual is

2   "disqualified."  "Disqualified" means that the

3   individual does not meet hiring criteria or DOT

4   regulations.

5       Q.   And so where would one find the phrase

6   "disqualified"?  Would that be in Workflow?

7       A.   I'm not sure what -- as in disquali- -- do

8   you have something that I can look at?  Is there

9   something that you want me to look at?

10           I'm not sure if it's...

11      Q.   You testified that Swift uses the phrase

12  "disqualified."  Where have you seen that used?

13      A.   In a sentence.

14      Q.   Okay.  Was that sentence in an email or was

15  that in Workflow or some other place?

16      A.   It can be -- it can be during an everyday

17  conversation, if someone comes to me and asks me will

18  you review this file.  This person --

19      Q.   And -- and when that is done, when that

20  review is done and the determination is made that the

21  applicant is disqualified, is that reduced to writing?

22      A.   No.

23      Q.   Is it put in any electronic database?

24      A.   That information?

25      Q.   The disqualification of that applicant.

1          A.    No.

2          Q.    If the applicant, for example, reapplies for

3     a job after he's been disqualified, does Swift have a

4     way to readily determine that that applicant previously

5     applied and was disqualified?

6          A.    If someone reapplied, there would be a

7     duplicate app.

8          Q.    And what would that mean to the recruiter?

9          A.    The recruiter wouldn't know until they tried

10    to download the application into -- well, today, it

11    would be App Manager.  They would have no idea that

12    there was a duplicate application until they tried to

13    download it.

14          And sometimes Workflow will tell you that

15    there's a duplicate record.  However, if the record is

16    extremely old, it's a possibility that it will -- you

17    will not get that information.

18          Q.    Will the recruiter then be able to review the

19    original application and any decision by Swift that

20    that person was not hirable?

21          A.    If they were able to locate the application,

22    they can --

23          Q.    Yes.

24          A.    They can open up that application and review

25    any of the notes that are made in there.  But normally

1    those type of notes aren't in the Workflow.

2                I mean, it just really -- it's case by case.

3    You might have an individual -- a recruiter who might

4    put notes in there and you may have a recruiter who

5    doesn't put notes in there.  So it would be case by

6    case.

7        Q.    All right.  If I understood correctly, the

8    only notes regarding a decision not to hire someone, in

9    the context of a criminal background report, would not

10   be made by the recruiter but by a security

11   investigator; correct?

12       A.    That's correct.

13       Q.    And those notes would be available to a

14   recruiter reviewing an old application; correct?

15       A.    No.

16       Q.    Would those notes be available -- strike

17   that.

18                Those notes are kept where?

19       A.    In the security department.

20       Q.    Okay.  Who was in charge of that database or

21   that file-keeping system?

22       A.    The security department.

23       Q.    Is there an individual who is in charge of

24   the security department?

25       A.    Yes.

1          Q.    Who is that?

2          A.    Gary Fitzsimmons and Shawn Driscoll.

3          Q.    And is one or both of those in charge of the

4    file-keeping system that you've described?

5          A.    I would say to the best of my knowledge, it

6    would be Shawn Driscoll.

7          Q.    Do you know how long that database has been

8    used by the security department or maintained by the

9    security department?

10              MR. FOSTER:   Object to the form, use of the

11   term "database."

12         Q.    BY MR. DOOLEY:   Ms. Cordova, do you

13   understand what I mean when I say "database"?  You

14   understand that I mean the file-keeping system that

15   you, yourself, described?

16         A.    Yes.

17         Q.    With that knowledge, how long has the Swift

18   security department maintained that file-keeping

19   system?

20         A.    Based on -- based on the knowledge, I would

21   say that they've -- I -- I'd be -- I'd be assuming, but

22   I would have to say that they began the file

23   record-keeping system when they began doing all -- when

24   their department opened.

25         Q.    And when was that?

1      A.    Security -- well, security itself has been

2   with the company since the company opened.   The

3   investigations department opened -- that was created

4   prior to 2006.

5      Q.    Okay.   Look at topic 4, if you would, on

6   Plaintiffs' Exhibit 1.   Read that to yourself.

7            Ms. Cordova?

8      A.    I've read it.

9      Q.    Did you have any discussions with

10  Mr. Driscoll about the identity of applicants who were

11  denied employment by Swift based in whole or in part on

12  information in consumer reports?

13     A.    No, I did not ask him of the identity.

14     Q.    All right.   Did you have any discussions with

15  any Swift employees about the identity of those

16  applicants?

17     A.    In discussing the record-keeping ability?

18            I --

19     Q.    We're looking at topic -- I'm sorry.   Go

20  ahead.

21     A.    In discussing the record-tracking ability, I

22  did discuss the identity with Jim Pope, who is our

23  IT person.   And --

24     Q.    And --

25     A.    Go ahead.   I'm sorry.

1      Q.   No, I didn't mean to cut you off.  I thought

2  you were done.  "And" what?

3      A.   And we discussed this information and there's

4  no -- there's no way, other than a record-by-record

5  search -- which would take thousands of hours -- to

6  identify individuals and determine whether or not a

7  consumer report had been ordered.

8      Q.   Okay.  Is that what Mr. Pope told you?

9      A.   Yes.  He said there is no -- there is

10  currently no tracking ability.

11      Q.   Did Mr. Pope talk to you at all about

12  HireRight?

13      A.   No.

14      Q.   Do you know what HireRight is?

15      A.   Yes.

16      Q.   Did anyone talk to you about HireRight's

17  ability to identify individuals about whom Swift

18  procured a consumer report?

19            MR. FOSTER:  What topic are you on now?

20            MR. DOOLEY:  HireRight.

21            MR. FOSTER:  What topic number?

22            MR. DOOLEY:  Number 13.

23            MR. FOSTER:  That's about all communication

24  between Swift and HireRight about the lawsuit; correct?

25            MR. DOOLEY:  Well, the allegations and the

1    facts alleged therein.

2             MR. FOSTER:  Yeah, the lawsuit; okay?

3             So what -- rephrase your question based on

4    the proper subject heading.

5             MR. DOOLEY:  Madam Court Reporter, can you

6    read back the question that I asked?

7             COURT REPORTER:  Sure.

8             (*The record was read as follows:*

9             *QUESTION:  Did anyone talk to you about*

10   *HireRight's ability to identify individuals about whom*

11   *Swift procured a consumer report?*)

12        Q.   BY MR. DOOLEY:  The lawsuit is about Swift

13   procuring consumer reports.  So I'd ask that you answer

14   my question as it was stated.

15        A.   I had no discussion.  I read an email.

16        Q.   Can you tell me about that email that you

17   read?

18        A.   The email was between HireRight's counsel and

19   Swift's attorneys requesting how many consumer reports

20   had been ordered within Swift's accounts.

21        Q.   Did you discuss that email with anyone?

22        A.   Swift's attorneys, yes.

23             MR. DOOLEY:  Let's take just a short break;

24   okay?

25             MR. FOSTER:  Okay.  Very good.

```
 1                    MR. DOOLEY:  Feel free to mute me.

 2                    MR. FOSTER:  I'll try.

 3               (Recess from 11:15 a.m. to 11:32 a.m.)

 4                    MR. FOSTER:  All right, Matt, we're back.

 5          Q.   BY MR. DOOLEY:  Ms. Cordova, before we took

 6     the break, we were talking about communications between

 7     Swift and HireRight.  Do you recall that?

 8          A.   Yes.

 9          Q.   And you referenced an email that you reviewed

10     in preparation for answering questions about topic 13

11     on Plaintiffs' 1.

12               Just so I'm clear, did you review any other

13     documents regarding communications between Swift and

14     HireRight?

15          A.   No, just that email.

16          Q.   All right.  So aside from what's contained in

17     that email, do you have any additional information that

18     you could have learned from anyone that you spoke with

19     about the communications between HireRight and Swift

20     about this case?

21          A.   We had three different communications with

22     HireRight.

23          Q.   And that would be separate from the email?

24          A.   That's correct.

25          Q.   Would you please tell me when the first one
```

1    took place?

2         A.    The first communication was through

3    Michelle Deutsch to HireRight after the lawsuit had

4    been filed --

5         Q.    About --

6         A.    -- requesting --

7         Q.    Go ahead.

8         A.    -- requesting that they preserve the records.

9         Q.    Do you know the date of that communication?

10        A.    I do not know the exact date.  I do know that

11   that happened in September of 2011, I believe.

12        Q.    Are you looking at any documents right now?

13        A.    Just the exhibit that you provided me.

14        Q.    Okay.  Was that a communication that was put

15   into writing or was that just a telephone call?

16        A.    I believe she sent them an email.

17        Q.    Okay.  How did you learn about that email if

18   it was not part of the more recent communication in

19   July of 2012?

20        A.    Because I spoke to Michelle.  I was -- I was

21   in the department -- or I'm in the department, and that

22   was something that we met about.

23        Q.    When you say "the department," would you tell

24   me what department that is?

25        A.    The recruiting department.

1      Q.    Okay.  When was the second communication?

2      A.    The second communication was, again, in

3   September of 2011, when we requested a consent form

4   from them.

5      Q.    When you say a "consent form," can you tell

6   me what you mean?

7      A.    It's what they -- they have it titled as a

8   "HireRight Consent Form."

9      Q.    And who made that request?

10     A.    The investigations department.

11     Q.    Is there a person who made that request on

12  behalf of the investigations department?

13     A.    Angelica Flores.

14     Q.    And was that a communication in email or by

15  phone?

16     A.    I'm not sure whether she contacted them by --

17  by phone or by email.

18     Q.    And did HireRight respond with a copy of the

19  consent form, as requested?

20     A.    Yes.

21     Q.    When was the third communication?

22     A.    The third communication was when the

23  attorneys working with Swift were contacted requesting

24  how many consumer reports had been ordered in a

25  two-and-a-half-year time frame.

```
 1        Q.    Is that the email from July of 2012 or is
 2   that a separate communication?
 3        A.    That's the email from July of 2012.
 4        Q.    Okay.  Aside from those three communications
 5   with HireRight, has Swift had any additional
 6   communications with HireRight about this case?
 7        A.    No, not that I'm aware of.
 8        Q.    All right.  I'd like you to flip back, if you
 9   would, to page 5, number 4, which is a topic regarding
10   the identity of applicants who were denied employment
11   because of a consumer report, in whole or in part.
12             We touched upon it earlier.  I'd like to
13   focus on it a bit more.  And I don't want to rehash the
14   entire hiring process, but as the corporate
15   representative of Swift, I want to understand, so that
16   I can apply some deductive reasoning, how one might be
17   able to develop a subset of applicants who were denied
18   employment based in whole or in part on a consumer
19   report; okay?
20        A.    Understood.
21        Q.    Now, I understand that the Swift security
22   department has a separate database that's kept
23   separate, in large part, because of the sensitive
24   nature of the information; correct?
25        A.    Yes.  They have a different filing system.
```

```
 1        Q.    All right.  And I don't mean to confuse you,
 2   Ms. Cordova, by using the word "database" versus
 3   "filing system," but can you tell me why that
 4   distinction should be made?
 5        A.    The distinction between "database" and
 6   "filing system"?
 7        Q.    Why do those -- why are those two terms
 8   separate and distinct to you?
 9        A.    Well, a database is software, where records
10   are stored, and a filing system is information that you
11   key in, whether it's first name, last name,
12   Social Security number, and you're manually entering
13   that data.  In a database, the data's already stored,
14   so you're not manually entering that information.
15        Q.    Okay.  And forgive me if I'm repetitive, but
16   do you know if that filing system is kept on paper
17   versus electronically on a computer?
18        A.    In the investigations department?
19        Q.    Yes, ma'am.
20        A.    If -- if -- if -- their -- what they have
21   that I've seen -- and I didn't ask them, but it should
22   be the same, because I'm not sure if you recall but I
23   was also in that department -- it's an Excel
24   spreadsheet.  So it can be on paper if they print it
25   out, but otherwise it's contained in someone's
```

1    computer.

2        Q.   I see.

3            And that Excel spreadsheet would include the

4    notes from the communications between applicants and

5    security personnel?

6        A.   The hard copy file would include the notes.

7        Q.   Okay.  When Swift investigations personnel --

8    why don't I just call them Swift investigators, to save

9    a few words?

10           When Swift investigators contact an

11   applicant, is it because a criminal background report

12   had something on it that warranted investigation?

13       A.   It's based -- well, there's -- there's a

14   couple of reasons why.  You -- you may have someone who

15   willingly disclosed information on -- originally on the

16   application and it's questionable, so it's submitted to

17   the investigations department.  Or you have a

18   widescreen return and that widescreen does not match

19   the application.

20       Q.   I see.

21           And in the latter sense that you just

22   described, the latter scenario with the widescreen,

23   does the hard copy printout with the note section of

24   the file-keeping system reference the fact that the

25   widescreen did not match the application?

1      A.   Can you re- --

2      Q.   Sure.

3           MR. FOSTER:   I was going to object to the

4  form.

5      Q.   BY MR. DOOLEY:   Sure.   Why don't I -- why

6  don't I rephrase it?

7           Does the file-keeping system have information

8  in it to indicate when an applicant's widescreen report

9  does not match the application?

10     A.   Not -- not that I'm aware of.

11     Q.   Let's talk about the initial scenario that

12  you described, which would be the self-disclosure.   I

13  assume that the self-disclosure might be on the border

14  with respect to hiring guidelines and therefore

15  required approval from security; correct?

16     A.   Yes.

17     Q.   And when Swift security folks approve or

18  disapprove on that basis, meaning a self-disclosure

19  that is okay or not okay, does the file-keeping system

20  have information in it about that decision?

21     A.   The -- I -- you confused me, I apologize.

22     Q.   I'm sorry.

23     A.   But I -- can you --

24     Q.   It was a confusing question.   Let me re-ask

25  it.

1                You described two scenarios that would

2    warrant review by security:  One, a self-disclosure;

3    and two, an inconsistent widescreen.

4                Correct?

5         A.   Yes.

6         Q.   And when I say "inconsistent widescreen," I'm

7    saying that the information contained on the

8    applicant's application about his background is not the

9    same as what the widescreen shows; okay?

10        A.   Okay.

11        Q.   Now, with those two scenarios, does the Swift

12   investigations department distinguish when their review

13   is undertaken for the first scenario versus the second?

14               MR. FOSTER:  What do you mean by

15   "distinguish"?

16        Q.   BY MR. DOOLEY:  Ms. Cordova, was my question

17   vague to you?

18        A.   I -- no, it was -- it was clear.  I mean,

19   I -- I realize -- but "distinguish," do you mean do

20   they -- it doesn't matter what method, whether or not

21   the widescreen was inconsistent or whether it was

22   self-disclosed, because an interview is going to be

23   conducted.

24               So they do not -- it's -- is that -- do they

25   put one in one bucket and one in another bucket, is

1   that what you're asking me?

2      Q.   Yes, ma'am.

3      A.   No.

4      Q.   All right.  So an interview will be

5   conducted, no matter what.  And after that interview,

6   there will be a note made in the file-keeping system

7   regarding approval or disapproval; correct?

8      A.   Correct.

9      Q.   Will that note contain any additional

10  information about the reason for the decision to hire

11  or not hire?

12     A.   Well, the reason is based off of the

13  interview and the information that they receive from

14  the applicant.  It's all firsthand.

15       So they -- yes, they will make their notes.

16  However, the decision is based off of firsthand

17  information that's disclosed by the applicant.

18     Q.   Okay.  And the interview only takes place --

19  let's say it's -- let me pose a scenario, because

20  that's an easier way for me to phrase my question.

21       An application does not have any

22  self-disclosure on it but there's an inconsistent

23  widescreen; okay?  That's the scenario; okay?

24     A.   Okay.

25     Q.   An interview will take place; correct?

EXHIBIT C

1        A.    Correct.

2        Q.    That interview would not have taken place if

3   the widescreen was consistent with the application;

4   correct?

5        A.    If the widescreen was consistent with the

6   application, the applicant would have self-disclosed

7   information and there's a big possibility that the

8   interview would still take place.

9        Q.    I'm sorry, my -- my scenario was different

10  than what you described.  I'm saying the application

11  did not have any self-disclosure.  In response to the

12  question, "Do you have a criminal record," applicant

13  says no.  That's the scenario; okay?

14       A.    Okay.

15       Q.    A widescreen is ordered that shows a criminal

16  record; okay?

17       A.    Okay.

18       Q.    Now, in that instance, an interview would

19  take place between the applicant and the security

20  person; correct?

21       A.    Correct.

22       Q.    But if the applicant had said no and the

23  widescreen report confirmed his answer was correct,

24  there would be no interview with the security

25  department; correct?

```
 1        A.    That's correct.

 2        Q.    Thank you.

 3              The interview with respect to inconsistencies

 4   between -- actually, strike that.  Strike that.

 5              Look at number 3, if you would, Ms. Cordova,

 6   which asks about the number of applicants who were

 7   denied employment based in whole or in part on a

 8   consumer report.

 9              At the beginning of the deposition, I believe

10   you indicated that you did not know the answer to that;

11   correct?

12              MR. FOSTER:  Objection, misstates her

13   testimony.

14        Q.    BY MR. DOOLEY:  Do you know the answer to

15   that, topic 3, Plaintiffs' 1?

16        A.    Swift does not decline employment based on

17   third-party information from a consumer report.  An

18   interview is conducted.  And based off of the

19   interview, a decision is made.

20        Q.    Do you understand the phrase "based in whole

21   or in part"?

22        A.    Yes, I do.

23        Q.    Please tell me what your understanding of

24   that phrase is.

25        A.    My understanding is whether -- my
```

1    understanding of that is whether or not a -- one -- one

2    inclination could be a decision-maker.  That's what my

3    understanding of that is.

4         Q.    Forgive me, I don't understand your answer.

5    What do you mean by "one inclination could be a

6    decision-maker"?

7         A.    Well, "based in whole or in part" is either

8    you're looking at the person as a whole or you're

9    looking at the person as a partial.  If -- with -- what

10   you're asking here is if we were looking at a consumer

11   report, did we make a decision based off of anything in

12   that consumer report or did we make a decision

13   100 percent based off of the consumer report.  That's

14   what my understanding is.

15        Q.    All right.  Thank you.

16              Ms. Cordova, I appreciate your understanding

17   of that phrase.  And so that I'm clear, I -- I want to

18   make sure that I understand one more thing, and that is

19   the scenario that I described with respect to an

20   interview being conducted where an applicant does not

21   self-disclose but a widescreen shows a criminal

22   history.  Do you remember that --

23        A.    Yes.

24        Q.    -- that scenario?

25              That report is being used to make a decision

1   that an interview is necessary; correct?

2       A.   That's correct.

3       Q.   All right.  And when that person is

4   interviewed and a decision is made, the decision is

5   maintained or on file, if you will, with the security

6   department's file-keeping system; correct?

7       A.   Correct.

8       Q.   That would be the Excel spreadsheet that you

9   referenced; correct?

10      A.   Yes.

11           MR. FOSTER:  Just so the record is clear,

12  Matt, you guys have that Excel spreadsheet and you have

13  the hard copy stuff, the two different things she's

14  talked about in her deposition.

15           MR. DOOLEY:  Thanks, Brian.

16           We may be nearing the end sooner than we'd

17  thought.  If you'd be so kind as to give us just a

18  brief, five-minute break, hopefully we can wrap this up

19  relatively shortly; okay?

20           MR. FOSTER:  Okay.  Very good.  Thank you.

21           MR. DOOLEY:  Thank you, Brian.

22           (Recess from 11:50 a.m. to 12:00 p.m.)

23           (Mr. Kroeger left the room.)

24      Q.   BY MR. DOOLEY:  Ms. Cordova, thank you for

25  the break.

EXHIBIT C

1              To go back to where we left off, when an

2    applicant self-discloses a criminal record, is a

3    widescreen pulled?

4         A.   When a -- I'm sorry, can you repeat the

5    question?

6         Q.   Sure.

7              When an applicant self-discloses a criminal

8    background, is a widescreen pulled?

9         A.   Yes.

10        Q.   What's the basis for that?

11        A.   We bundle order.

12        Q.   So you're saying that you don't choose

13   a la carte to order a widescreen, it just happens to

14   come in with the package?

15        A.   That's correct.

16        Q.   And so I'm clear, what is the nature of the

17   bundle?  What's in the bundle?

18        A.   It is MVR, CDLIS -- would you like me to

19   describe what --

20        Q.   I actually know what you're talking about --

21        A.   Okay.

22        Q.   -- when you just use the acronyms --

23        A.   Okay.

24        Q.   -- so go ahead.

25        A.   Okay.  An MVR, CDLIS, Social Security trace,

EXHIBIT C

1   the employment history -- which is also referred to as

2   a DAC -- and a widescreen.

3        Q.   All right.  When an applicant self-discloses

4   information on an application, is it compared against

5   the information contained on the widescreen?

6        A.   No.  And all -- it depends on what it is that

7   they self-disclosed.

8             (Mr. Kroeger entered the room.)

9        Q.   BY MR. DOOLEY:  Please explain.

10        A.   If an applicant self-discloses information

11   prior to us receiving a widescreen, the information is

12   sent over.  The individual is set up for an interview.

13        Q.   Okay.  Back towards the beginning of the

14   deposition, we talked about a group of applications

15   that were rejected on their face for, among other

16   reasons, self-disclosed crimes.  Remember that?

17        A.   Yes.

18        Q.   And so now that -- in your testimony you've

19   referenced a scenario where someone has self-disclosed

20   and a background report has not been obtained --

21             (Interruption.)

22        Q.   BY MR. DOOLEY:  Can you explain -- I'm sorry,

23   go ahead.

24             MR. FOSTER:  No, no, let's go by question and

25   answer.

1      Q.    BY MR. DOOLEY:  There is a scenario that

2   you're describing where a background report has not

3   been obtained but an interview has been scheduled.  Can

4   you please tell me the situation or situations when

5   that takes place?

6      A.    The records have been ordered; however,

7   because we have the information, what happens is that

8   individual is scheduled for an interview.  They are

9   sent over to the investigations department.

10          And at that point -- the record could be

11   back, the record has -- may have already been ordered,

12   but at that point, that -- the investigations

13   department takes over on that file.

14      Q.    Okay.  And after the report is available for

15   Swift's review, is it compared to the information

16   provided by the applicant during the interview?

17      A.    They schedule the interview once they have

18   the information; however --

19      Q.    Okay.

20      A.    -- the questions that are asked are

21   open-ended questions.

22          The questions -- when interviewing an

23   applicant, you are asking the applicant if they have

24   ever been convicted.  You're asking them open-ended

25   questions.  You're -- once they disclose any type of

1    information, you reiterate, "Is there anything else?

2    Is there anything else you would like to disclose at

3    this time?"

4              And during that process, the individual is

5    giving you information, and it may or may not be on the

6    widescreen.

7         Q.   Okay.  Is the widescreen available to the

8    interviewer during that process?

9         A.   Yes.

10        Q.   Is it being reviewed by the interviewer

11   during that process?

12        A.   They have it available if they need it.

13        Q.   And why would they need it?

14             MR. FOSTER:  Hey, Matt, again, I'm going to

15   object here, and I've been very lenient.  You're way

16   beyond the scope of anything that has to do with your

17   30(b)(6) notice and I'm not going to let this continue.

18             MR. DOOLEY:  Are you instructing her not to

19   answer that question, I'm sorry?

20             MR. FOSTER:  Yeah, the objection was that

21   you're way beyond the scope of the 30(b)(6) notice.  So

22   unless you can explain to me how it is -- and I'm

23   wanting you to focus on the specific number and the

24   specific language in your notice.

25             MR. DOOLEY:  Okay.  Sure.

1            Number 4 seeks the identity of applicants who

2    were denied employment by Swift based in whole or in

3    part upon a consumer report.  And the question requests

4    whether the person who's going to be making a hiring

5    decision is looking at a consumer report.

6            MR. FOSTER:  And she's already testified that

7    Swift does not deny based on consumer report.

8            MR. DOOLEY:  Well, I understand that's her

9    testimony, but my question was well within the scope of

10   that topic.

11           But I'll move on.

12       Q.   BY MR. DOOLEY:  Earlier we talked about

13   codes.  We talked about --

14           MR. DOOLEY:  And, Brian, this is still within

15   the purview of topic 4.

16       Q.   BY MR. DOOLEY:  -- codes.  I mentioned D12

17   and you mentioned to me that that was a code that is

18   used for current employees; correct?

19       A.   Yes.

20       Q.   Are individuals who are in orientation

21   considered employees?

22       A.   No.

23       Q.   Aside from the Excel file that the security

24   department maintains, is there any record of how many

25   reviews the security department undertakes each year?

1       A.   Aside from their Excel spreadsheet?

2       Q.   Yes.

3       A.   No, not -- not that I'm aware of.

4       Q.   Aside from the file-keeping system or Excel

5  database that's kept by the security department, is

6  there any other document or database or file-keeping

7  system that records any decision to hire or not hire an

8  applicant?

9       A.   I'm not understanding your question.

10      Q.   Sure.

11           Aside from the file-keeping system maintained

12  by the security department, are there any other

13  databases or file-keeping systems where a person can

14  determine if an applicant was hired or not?

15      A.   To determine whether an applicant was hired

16  or not.

17           There's a date that's placed in Workflow once

18  an applicant's been hired, the date that they were

19  hired.  So if you opened the records in Workflow, you

20  would have to go to the hire tab, and if a date has

21  been placed in there, you know that that individual was

22  hired.

23      Q.   And by the same logic, if that field is

24  blank, that individual was not hired?

25      A.   Yes.

1      Q.   At the beginning of this deposition, we

2  talked about your efforts to identify information

3  covered in topic 3, which would be the number of

4  applicants who were denied.  And you mentioned -- and I

5  don't want to misquote -- but you mentioned that

6  something like that would take "thousands of hours."

7  Do you recall that testimony?

8      A.   Yes, that's true.

9      Q.   Okay.  Can you tell me the basis for your

10  testimony that it would take "thousands of hours"?

11      A.   Those are -- those would be record-by-record

12  searches.  The -- what we would have to do is go

13  through every single file in Workflow, open it up,

14  determine whether a consumer report had been ordered,

15  go back, talk to the recruiter, the processor, the

16  investigations department, and hopefully they'll

17  remember what -- what happened -- as a -- as a

18  recruiter, you talk to thousands of people, so -- I

19  mean, that's -- you're relying on someone's memory --

20  and hopefully be able to obtain some type of

21  information, but we wouldn't be able to guarantee that

22  it would be accurate.

23      Q.   And I assume that no such review has been

24  undertaken as of today?

25      A.   That's correct.

1        Q.   Ms. Cordova, you mentioned among the various

2   people that would be consulted in that process, you

3   mentioned going to the security department and speaking

4   with the people there about a particular applicant.

5   Can you elaborate on the discussions that would need to

6   be had with that department?

7        A.   I'm not sure what you're asking for.  You

8   said "a particular applicant."

9        Q.   Well --

10        A.   On a record-by-record search?

11        Q.   You've indicated that it was impossible to

12   determine the number of applicants because it would

13   require a record-by-record search.  I asked you how you

14   would do that, if you were going to, and you indicated

15   there was a process in place, I suppose, or a process

16   that could be used where somebody would speak with the

17   recruiter, they would look at files in the databases,

18   and they may speak to the security department; correct?

19        A.   It's not a process.  It's my train of thought

20   of what I would do and who I would talk to in order to

21   get some type of information, because there's no way

22   for me to pull a report.

23             I cannot query the information.  I cannot

24   pull a report.  I would have to go through the file.

25        Q.   Okay.  And part of that process, you

1   testified, included speaking with the security

2   department; correct?

3          MR. FOSTER:  Object to the form.

4       Q.   BY MR. DOOLEY:  Is that not your testimony,

5   Ms. Cordova, that part of that process you described,

6   that train of thought that you described, included

7   speaking with the security department?

8       A.   Yes, if they were involved, I would speak

9   with the security department.

10      Q.   All right.  And the security department is

11  involved when there's an inconsistency between the

12  application and the widescreen or there's a

13  self-disclosure on the application; correct?

14      A.   Correct.

15      Q.   And when you would get to the security

16  department, what questions would you ask?

17      A.   "Did you interview this applicant?"

18      Q.   And would there be a record of that in the

19  Excel file that you described?

20      A.   Yes.  If they interviewed the applicant, they

21  would manually enter that data in there.

22      Q.   All right.  And in that Excel file, would

23  there also be copies of the widescreen report or the

24  application or the self-disclosure?

25      A.   In the Excel spreadsheet or in the hard copy

1    file?

2         Q.    The hard copy file.

3         A.    They would have their notes and things

4    like -- such as that in the hard copy file.

5         Q.    The widescreen report itself, would that be

6    kept in the hard copy file?

7         A.    I've not had to pull a hard copy file so I

8    wouldn't -- I -- I wouldn't be able to say yes or no to

9    that.

10        Q.    Let me be more specific, and let me tell you

11   why I'm asking this.  On the Excel database, there are

12   hyperlinks for certain documents in the -- or on the

13   screenshot of a various applicant.  I can't access

14   those because I'm not logged into Swift's computer.

15             If you were logged into that Excel

16   spreadsheet, would those widescreen reports be

17   available?

18        A.    The hyperlink then would take you to

19   HireRight.

20        Q.    And the report would be somehow viewable at

21   that point?

22        A.    Yes.

23        Q.    Ms. Cordova, when in that train of thought

24   when you're talking to the security department and

25   you're going through these files, what are you looking

1   for to answer the question posed in topic number 3,

2   Plaintiffs' Exhibit 1?

3        A.   Well, I would be looking for anything,

4   actually.  If I -- in talking with the investigations

5   department, I would ask, number one, did they interview

6   the applicant, was the information obtained from the

7   application, did -- was that information true, was it

8   false.  There's -- there would be a ton of different

9   things.

10          I guess I'd have to look -- I'd have to have

11   the application scenario and --

12        Q.   Okay.

13        A.   -- know what it is -- what it is -- what my

14   target is, what is it that I'm asking, what is it that

15   I'm looking at, in order to ask the correct questions.

16          Because you may not even have investigations

17   involved.  You may have them involved.  There may be

18   other departments that I may need to speak to in order

19   to get a decision on the reason behind not hiring this

20   individual.

21        Q.   Investigations is the only department within

22   the Swift organization that obtains widescreen reports;

23   correct?

24        A.   Yes.

25        Q.   It's the only department that uses widescreen

1   reports at all; correct?

2        A.   Yes.

3        Q.   And it uses those reports in the course of

4   evaluating a candidate's employability; correct?

5        A.   No, they don't rely on the third-party

6   information from the consumer report.

7        Q.   Why is a -- why is a widescreen report even

8   obtained?

9        A.   It's part of the bundle package that

10  HireRight offers us.

11       Q.   What's the basis for Swift's decision to pay

12  the money to purchase the widescreen report?

13            MR. FOSTER:  I'm going to object, Matt.

14  You're getting way beyond any subject in your 30(b)(6)

15  and I'm going to ask you to tie it to a specific

16  subject.

17            MR. DOOLEY:  Hey, Brian?

18            MR. FOSTER:  Yeah, I'm here.

19            MR. DOOLEY:  Topic 3, which we're going over,

20  is intended to figure out the number of applicants.

21  And as we've tried to explore Ms. Cordova's train of

22  thought, she's taken us through the security department

23  and brought us to this point where the security

24  department has obtained widescreen reports for

25  apparently no reason.

1          Now, widescreen reports are the criminal

2     background reports.  I'm not sure how that is far

3     afield from topic number 3, given the fact that we've

4     gone down this road in the vein of that topic.

5          MR. FOSTER:  Well, the testimony has been

6     that the recruiter is the one who orders the bundled

7     package.  So I think it's way beyond the scope of any

8     subject to ask, you know, why it was ordered or things

9     of that nature.

10          MR. DOOLEY:  Okay.  And I also understand

11    that the security department is the only department in

12    the entire Swift organization that even has access to

13    these reports.  So I think I'm entitled to discover why

14    they do that from Swift's designee to a 30(b)(6) notice

15    that's intended to figure out specifically issues about

16    these consumer reports.

17          MR. FOSTER:  Well, what you're asking about

18    is the identity of people who were declined based on

19    the consumer report.  That doesn't have anything to do

20    with the recruiter's decision as to why they ordered as

21    to any particular applicant.

22          MR. DOOLEY:  It has to do with the security

23    department's use of these consumer reports to make

24    these decisions.  I understand that Ms. Cordova

25    testifies that they use something else.  I'm not

1    required to accept that.

2           Now, if you want to instruct her not to

3    answer or move for protective order on this question

4    about why Swift is buying these reports when apparently

5    they don't mean anything, then we can do that.

6           MR. FOSTER:  Based on the fact that you

7    haven't articulated any subject area here that would

8    remotely touch on why something was ordered, I'm going

9    to instruct the witness not to answer.

10          MR. DOOLEY:  All right.  Well, let me make my

11   record on this issue, then.

12          The topic in the deposition notice says,

13   topic 4, Plaintiffs' 1, the witness is going to be

14   asked questions about the identity of applicants who

15   were denied employment based in whole or in part on

16   consumer reports.

17          The only department in the entire company --

18   which she's here to testify on behalf of -- is the

19   security department, when it comes to using these

20   reports.  That's it.  The security department reviews

21   these reports to make decisions.  Those decisions

22   whether to hire or not hire fall directly within topic

23   4.  And the witness has testified that these reports,

24   for some reason, don't have anything to do with that

25   process at all.

1            And when I asked why the reports are then

2    procured, you have put your foot down and said it will

3    not be answered.

4            MR. FOSTER:  And again, Matt, she testified

5    earlier that the reports are ordered by the recruiting

6    department.  And so your question as to why a

7    particular recruiter decided to order a particular

8    consumer report, that's really what you want

9    Ms. Cordova to answer?

10            MR. DOOLEY:  No, that's not it at all,

11   Brian.  Her testimony is that these reports are only

12   obtained because they happen to be part of a bundle.

13   It's like I order a plate of food and it comes with

14   broccoli but I don't eat it because I don't like

15   broccoli.

16            Now, I want to know why Swift is getting

17   reports that they apparently don't use, reports that

18   are at the heart of topic 4, Plaintiffs' 1.  My

19   understanding is you're instructing her not to answer,

20   and if that's the case, that's the case.

21            MR. FOSTER:  Okay.  Well, based on the record

22   that's been made, you haven't established any

23   tangential connection to any of the subjects that are

24   contained within your amended 30(b)(6) deposition

25   notice.  But in the interests of wrapping this

1    deposition up, I'm going to go ahead and let -- let her

2    answer the question, if she has any answer for you.

3           So go ahead and re-ask the question.  But I'm

4    not going to let you go much further than this, Matt.

5           MR. DOOLEY:  Thank you.  Thank you, Brian.

6      Q.   BY MR. DOOLEY:  Ms. Cordova, you just heard a

7    dialogue between me and your counsel which was not

8    intended to influence your answer to my question by any

9    means, so please don't let it.

10          The question that I asked was why Swift

11   spends the money on widescreen reports when they are

12   apparently not used by the security department.

13          MR. FOSTER:  Same objection.

14          You can answer if you know.

15          MR. DOOLEY:  We know that.

16          THE WITNESS:  The -- the bundle package that

17   was given to us by HireRight, the amount of money spent

18   on a widescreen is not much.  So whether or not we're

19   paying two pennies for it, 10 pennies for it -- or

20   10 cents for it, to be honest with you, it's just a

21   package that was ordered.  And because it is a package,

22   the company has said okay, we will go ahead and accept

23   this package because it does not -- it doesn't affect

24   the expensing portion of it.

25          I -- I guess that's what you're asking.  It's

1    not -- it's not a huge expense.  And so it's part of

2    the package that HireRight offers us.  We've accepted

3    it.

4         Q.   BY MR. DOOLEY:  Ms. Cordova, does Swift use

5    widescreen reports in any way at all?

6         A.   The investigations department does receive

7    those widescreen reports.  And if there is a widescreen

8    report that comes in that does not match the

9    information on an application, they will then request

10   an interview.

11        But any decision that is made is going to be

12   based on the information that they receive from the

13   applicant.

14        MR. DOOLEY:  Thank you

15        Madam Court Reporter, can you repeat

16   Ms. Cordova's answer for me, please?

17        *(The record was read as follows:*

18        *ANSWER:  The investigations department does*

19   *receive those widescreen reports.  And if there is a*

20   *widescreen report that comes in that does not match the*

21   *information on an application, they will then request*

22   *an interview.*

23        *But any decision that is made is going to be*

24   *based on the information that they receive from the*

25   *applicant.)*

```
 1              MR. DOOLEY:  Thank you.

 2              Ms. Cordova, I believe that's all I have for

 3    you.  I appreciate you being available today as the

 4    face of Swift and the voice of Swift.

 5              Your counsel will instruct you on reading and

 6    waiving.

 7              MR. FOSTER:  Okay.  Thank you.

 8              MR. DOOLEY:  But I'll --

 9              MR. FOSTER:  Go ahead, Matt.

10              MR. DOOLEY:  But, Brian, before you do that,

11    I just want to make sure we do have clarity that we're

12    adjourning this deposition with respect to the topics

13    that we've agreed upon prior to joining together

14    today.  It by no means constitutes a waiver of our

15    right to seek to depose Ms. Cordova, or whoever else is

16    designated as Swift's corporate representative, on the

17    remaining topics that we're still fighting about.

18              MR. FOSTER:  Yeah, we understand that you may

19    seek to do that.  And you, by the same token,

20    understand that we will, indeed, oppose that.  So,

21    again, I'm not sure that we need to make a record on

22    that.

23              But with that having been said, my client

24    will read and sign.

25              MR. DOOLEY:  Thanks, Brian.  You guys have a
```

1    great day.

2              MR. FOSTER:   Hey, you, too.   Thank you.

3              MR. DOOLEY:   Bye-bye.

4         (12:28 p.m.)

5

6         _____
          30(b)(6) REPRESENTATIVE MICHELLE CORDOVA

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT C

1   STATE OF ARIZONA      )
                           )  ss.
2   COUNTY OF MARICOPA     )

3                    C E R T I F I C A T E

4              BE IT KNOWN that the foregoing deposition

5   was taken before me, WANDA J. CURRY, a Certified Court

6   Reporter, Certificate No. 50366, in and for the State

7   of Arizona; that the witness before testifying was duly

8   sworn by me to testify to the whole truth; that the

9   questions propounded by counsel and the answers of the

10  witness thereto were duly taken down by me in shorthand

11  and thereafter reduced to computer print under my

12  direction; that pursuant to request, notification was

13  provided that the deposition was available for review

14  and signature; that the foregoing 67 pages are a true

15  and correct transcript of all proceedings had upon the

16  taking of said deposition, all done to the best of my

17  skill and ability.

18             I FURTHER CERTIFY that I am not related to

19  nor employed by any of the parties hereto, and have no

20  interest in the outcome.

21             DATED at Phoenix, Arizona, this 16th day

22  of September, 2012.

23                    _____

24                    Wanda J. Curry
                       Certified Court Reporter
                       Certificate No. 50366

25